We'll hear the next case Barnes v. Fedele. Your Honor, this is Ira Feinberg. I was appointed by the court to represent Mr. Barnes in this appeal. The court has granted permission for my associate Alan Mendelson to argue the case. He is on the phone and prepared to go forward. Thank you, Mr. Mendelson. May it please the court. My name is Alan Mendelson and I, along with my court's permission, I ask to reserve two minutes of my time for rebuttal. That's fine. In 2014, this court reversed the decision by the district court for the Western District of New York to grant summary judgment to appellees. While the court upheld the lower court's ruling that the confiscation of Barnes' religious head covering violated its purely established First Amendment rights, the court reversed the holding that appellees were of the record as to whether there was a legitimate penological interest for restricting inmate selection of religious headwear based on their registered religious affiliation. The court wanted to know whether there was a penological interest supporting a policy that restricted Jewish inmates to wearing yarmulkes and only permitted inmates registered as Rastafarians to wear a solid coat, which I will refer to as a TK. The issue before the court now is whether the district court erred in granting appellees motion for summary judgment on the ground that appellees were entitled to qualified immunity and in denying Barnes' motion for summary judgment. You know, help me a little bit on this. The various defendants, one, I gather, if my memory serves, was essentially responsible for this, the practice, the rule of, with respect to the headgear, and the others were following that rule. Is that right? Your Honor, you're right. There are a number of appellees, and a number of them were involved in different ways. Appellee Nuttall is the individual who, the only appellee who was actually involved in the approval of the policy, the directive, that that issue here. Right. My question then is, how does our remand of this to the district court, how does that affect the, Nuttall, is that his name, how does that affect the inquiry of the district court as to his behavior in a different way, and ask a different question than that of those who followed what the Nuttall argument or policy was? I mean, how do you look at the person, how differently was the district court supposed to look at the creator of the policy, and how was it to look at the people who followed it? Your Honor, well, I think the first point I would note is that, you know, this court did remand the case specifically to identify a penological interest justifying the policy. The only explanation of the policy that was provided on remand was by Officer Chapious, Paul Chapious, who admitted in his declaration that he had no knowledge of the policy itself. He testified as to his understanding of the policy. Well, he, let me, he acknowledged that he had no part in writing the directive or creating the directive, but I take it from his declaration that he was involved in implementing it, so why would he not have had a foundation to explain what the purpose was based on his being involved in the implementation of the directive? I think that's a fair point. I think that he can certainly testify to his understanding of the policy, but I think it's noteworthy that Officer Nuttall did not submit a declaration, and I think in any event, there really can be no legitimate penological interest to justify a policy that distinguishes based on the registration, the religious registration of inmates, and I think, so even if we remanded it again for further proceedings, our position is there is no penological interest that could be offered that would explain, that would justify this policy. Well, apparently, apparently, they agreed with you because ultimately, they altered the policy, and you could wear the solid cobb even if you were Jewish. It didn't affect your page. That was okay with them, wasn't it? Was that the case? That's correct, Your Honor. The policy has been changed, and of course, the issue now is qualified immunity. Yes, so that's what I want to ask you, and that's the thing that puts Mr. Nuttall in an interesting position because he took the view below, did he not, that white changed everything, and so therefore, unless the facts matched up, he was entitled to qualified immunity, but the district court went ahead and found, pursued our directive, and looked at penological interest, right? That's all correct, Your Honor, and I will address the White v. Poli decision in a moment. I wanted to make sure I did respond to one of the other questions I received from Your Honor, which was regarding the different standards that should apply to certain of the appellees versus Nuttall, and I think this court has already acknowledged that following an existing policy or the direction of a superior is not in and of itself sufficient to support a grant of qualified immunity. This court has held that when officials follow an established prison policy, their entitlement to qualified immunity depends on whether a reasonable officer might have believed that the challenge order was lawful in spite of the legitimate penological interest supporting the directive. They would have been required. Incidentally, I should point out something that isn't entirely obvious necessarily to us, and that is you have three male judge voices, and it's a little difficult for you to know which judge is asking what, whereas we know who you are, so it makes it a little difficult. The question to me is whether I'm a guard, and I'm told by my seniors that I have to do this with respect to headgear and make them take it off, and I am required to either disobey what I've been told by my superior officer to do or to pay in the end for having done something unconstitutional. Is that right? Well, I think that you raise a very good point, and it's a point that I think comes up with qualified immunity cases routinely, but if there is no violation of clearly established law, which this court has already held there has been a violation of clearly established law, so the first prong is in our view taken care of. You have one minute, by the way, one minute. Okay. The only other way there could be a legitimate penological interest is if it would have been reasonable for the officers to believe that his conduct did not violate plaintiff's rights, and in our view, it would not have been reasonable for an officer to believe that taking away an inmate's chosen religious headwear based on his or her sincerely held religious belief simply on the basis that that person is registered as a different religion, it would be unreasonable for an officer to think that would be appropriate or constitutional. Okay. You have some time for rebuttal. We'll hear from the other side. Thank you. Good morning, Your Honors. This is Kate Nevue for respondents. Your Honors, the defendants here did not confiscate plaintiff's headgear, which as we now know and agree with the court was not constitutionally permissible, but at the time they did not believe, they believed that it was permissible not only because of plaintiff's registration as Jewish, as plaintiff's counsel said, but also for security reasons. And that was the question that this court directed the examined on remand, and that is what the district court did. And the question of security was set out both in the record and in this court's prior decision in Benjamin versus Coughlin. As the court noted, defendant Chappius, who is in fact not an officer, but was at the time the deputy superintendent for security at the facility, implemented the policy and his understanding was therefore relevant and probative to the fact that the sellout cobs were, as this court again noted in Benjamin, a security, post security threat. And at the time, the way that docs chose to handle that was to restrict the prevalence of those within the facility based on religious designation. And again, this is something that this court in Benjamin versus Coughlin had held was, had specifically said that could be done. In that case, it was based on restriction to a particular location, but the court held that it was acceptable to treat plaintiffs differently from other religious groups with respect to headgear. And that is a quote from the court at page 579. So the question here with regard to whether there was legitimate phenological interest is not merely, as plaintiffs said, registration, which at the time it was clearly established that that was not a legitimate interest, but also security. Further, with respect to the district court's examination of whether a right was clearly established, the district court, this court had said that the right that was clearly established was that you could not prohibit a sincere religious practice without a legitimate phenological interest. Of course, that was clearly established, but the district court held with support in the record and from intervening case law that it was not an inevitable conclusion from that clearly established right that you could not prohibit a sincere religious practice without a legitimate interest to then understanding. But isn't there a question as to whether there was a legitimate interest? Because there's no connection between religion and the wearing of that particular headgear. The legitimate question might have been, can you wear it when you have visitors? Or can you wear it when you're in the yard having exercise? But not, can you wear it if you are a Protestant instead of a Rastafarian? Your Honor, those are all different ways of attempting to implement the interest of reducing the prevalence of these particular crowns or salat khobs within the facility. And I'd like to point out something that is in the record at pages 58 and 105 of the joint appendix, which is at the time only Rastafarian inmates were permitted to wear a dreadlock. And therefore, under that, with that permission, only Rastafarian inmates would need a looser fitting head covering to fit their dreadlocks in. And so in that sense, the restriction of the salat khobs or crowns to Rastafarians was an attempt to essentially overlap the Venn diagram of people who needed this particular kind of headwear. Did the petitioner here have long hair and therefore a need or warrant having a different kind of head covering? Yes, Your Honor, he did. But when the policy was formulated and when people were implementing the policy, they all understood that he was not supposed to have them. And therefore, it was reasonable for them at the time, given the information they had, to say that the people who would be permitted to have a salat khob would be fully overlapping with the people who needed them, which were Rastafarians, who are the only ones who are allowed to wear dreadlocks. He did have dreadlocks, right? Yes, Your Honor. Yes, Your Honor, he did. I'm not disputing that he did, but I am noting that the record indicates that it was people's understanding at the time that he was not supposed to. And again, none of this is policy now. Anyone may wear dreadlocks. Anyone may exercise their sincere religious belief through their choice of headgear. But at the time, based on this court's decision and Benjamin, based on the understandings of the current policies, based on the lack of a clearly established right for the specific facts of this case, it was not plainly obvious to anybody. Your point as to everyone other than all the defendants was that they were following this directive. There was in their minds a legitimate security concern, and so they were abiding by their duties. What about not all? Why shouldn't this be remanded as to not all? There are two reasons, Your Honor. The first is if the Supreme Court's decision in White narrowed the law or clarified the law with regard to what clearly established means, then that doesn't require a declaration from him. And we did move on that ground. The other reason is, as the court noted— Well, weren't you required to abide by what we said the law was rather than your or the district court's interpretation of what the law was after intervening Supreme Court decision? Is that something that a district court can do? Say, oh, we have now read there's a new case, and what the Court of Appeals told us to do and what was wrong under this new case, and we're going to operate under the Supreme Court law rather than what the Second Circuit told us to do. Well, Your Honor, the district court did also— two things, Your Honor. First of all, the district court granted summary judgment to not all on effectively independent grounds, clearly established or legitimate phenological interests. But, Your Honor, I would point out that what the district— what the court directed on remand was, is there— it specifically directed that the district court examine the reasonableness of defendant's actions. And in order to examine the reasonableness of their actions, that required looking at them with respect to what their interests were and also what— how those were applied to the facts at the time. This is Judge Wesley. I apologize for interrupting your answer. This is an artful at best, and I— but you're all doing a wonderful job. But I just want to interject here. Wouldn't Nuttall be the very person that would be able to supply that information? He's the individual that about what the phenological interest was. It's because Chapious, who had some role in implementing it, reflects that this is what he understands the reason to be. That's kind of a backdoor explanation. Nuttall's the guy who could have explained it. Why didn't— I don't understand why he doesn't have an affidavit saying, well, we were concerned about it. We had security concerns, and so therefore we limited the use— the wearing of this particular type of head device to those who were specifically expressing their religious viewpoint. I don't understand this. Your Honor, I'm not going to pretend— Your Honor, I'm not going to argue that this is a record replete with detail that would be plainly— Maybe the answer is— maybe the answer is— maybe the answer is that Nuttall didn't think about that. And so therefore there was no phenological interest in that they were just restricting people to wearing something that was a portion— an expression of their own faith. Yarmulke for Jewish. This salatab for Rastafarians. I mean, Nuttall— I don't understand how Nuttall— I don't understand how the district court goes and decides that Nuttall reasonably relied upon a phenological interest when he's the author of it and never tells the district court, pursuant to our instructions, what it was. Your Honor, because the standard is objective, it looks at what a reasonable person with the information available to defendants would do. And based on this court's decision in Benjamin, which recognizes very plainly the security interests involved, again, this is not— the record here is not detailed, but it doesn't have to be. These are fairly simple questions. And the security interest, which was clearly recognized and understood to be a reason to treat religious groups differently in 1990, when this court decided Benjamin v. Coughlin. So I understand the court's frustration, but this is because the facts here are really very simple. There would be no frustration— Yes, Your Honor. And again, I recognize that. And as the court has noted, there are distinctions to be drawn here between the author of the policy and those implementing it. Yeah, decidedly. I mean, frankly, I'm not certain that Chapious is that, but David gets past the hearsay objection or problem. He may have been responsible for implementing it, but he says, my understanding is not I know for a fact, or I was told, or there was a directive that tells me this. My understanding is. Is that how you construct a record as to what a peniological interest is? Or we use your standard, well, we all know what it is because we know prison's a dangerous place? Your Honor, we saw back on what this court had previously held and had been established law for 14 years at the time of the directive, together with the record information from— Presume you're wrong on White, and that White does not, in our view, does not change the law. White is a Fourth Amendment situation. This is an Eighth Amendment situation. Fourth Amendment situations are particularly fact-specific. I presume that we disagree with it. What about not all then? What happens to Mr. Not All? Your Honor, again, because of the objective standard, the district court did properly grant summary judgment on who I— And if we find that standard's not there, if we find that standard's not there, we reverse that to not all, correct? Yes, Your Honor, but again, that's not— You're over your time. Why don't you finish up? Your Honors, I believe that I have addressed everything I intended to say, so unless the court has further questions, we will rest on our brief and ask that the judgment below be affirmed. Thank you. Mr. Mendelson, rebuttal? Sure. In addition to the absence of Nettles Edward, the peniological interest that's been offered is also questionable because the record suggests that Thorne's headwear would have been confiscated regardless of whether it had any potential as a hiding spot for contraband as long as it was anything other than a yarmulke, which appellees understood to be the only religious head covering Barnes is permitted to wear. Another point I'd like to reiterate is that the question in this case is not whether security concerns could constitute a legitimate peniological interest justifying prison restrictions on religious headwear. The issue is whether appellees have presented evidence of a peniological interest that would justify the directive's policy and the confiscation of Barnes' headwear because he was the wrong religion. The contrast of the facts here versus in Benjamin show precisely why appellees are not entitled to qualified immunity. Benjamin involved the policy that applied equally to all inmates who wanted to wear a certain type of head covering, whereas appellees curtailed Barnes' sincere religious practice because of his registered religious affiliation. While there could be a legitimate peniological interest for the religion-neutral policy at issue in Benjamin, which the government relies so heavily on, there can be no legitimate peniological interest for confiscating Barnes' religious headwear based solely on his registered religious affiliation. And in addition to the points about White v. Pauley being a Fourth Amendment case, you know, it really nearly re-emphasized the long-standing principle that clearly established law for purposes of a qualified immunity analysis cannot be defined too generally. In our view, the district court erred in reopening an inquiry that had already been decided by this court. And, you know, this court had already acknowledged in the prior ruling that in order to conclude that appellees violated Barnes' and Pauley's rights, it was not necessary for there to be precedent finding that the same conduct under the same circumstances constituted a First Amendment violation. So from this court's perspective, it was clear that a prison without some legitimate peniological interest and that appellees plainly were prohibiting an inmate's sincere religious practice here. And with that, I conclude my remarks and we rest on our brief. Thank you. And thank you for taking on the assignment. The court will reserve decision.